# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | |
|---|---|
| FRANK L. GRAY | ) |
| | ) |
|     **Plaintiff,** | ) **Case No. 2:09-cv-327-APR** |
| | ) |
| **v.** | ) |
| | ) |
| **UNITED STATES STEEL CORPORATION** | ) |
| **and UNITED STEELWORKERS UNION,** | ) |
| **Local 1014** | ) |
| | ) |
|     **Defendants.** | ) |

## OPINION AND ORDER

This matter is before the court on the Motion for Summary Judgment [DE 77] filed by the

defendant, Local 1014 United Steel Workers Union, on April 24, 2013, and the Motion for

Summary Judgment [DE 79] filed by the defendant, United States Steel Corporation, on April

24, 2013. For the following reason, the motions are **GRANTED.**

*Background*

The plaintiff, Frank L. Gray, an African American, began working at the U.S. Steel Gary

Works plant in January 1969. Gray worked in the Operational Services Division Machine Shop

until he retired on May 29, 2009. The employees in the Machine Shop rebuilt and repaired

mechanical equipment used in steel production operations. Employees in the machine shop

could be assigned to one of three assembly areas, a field crew that performed work outside the

Machine Shop and conducted on site repairs, or to one of fifteen machines. For many years,

machine operators who exceeded the performance standards U.S. Steel set would receive an

hourly incentive rate in excess of their base pay. The incentive pay made the machines a

desirable position within the Machine Shop.  When there was a permanent vacancy on a machine, the employees would bid for the job opening.  The bidder with the most seniority would be awarded the position.

In 1996, U.S. Steel did not have a sufficient number of qualified checkers to monitor the performance standards of each machine.  U.S. Steel proceeded to suspend the performance standard procedures and froze the incentive rates for the machines.  For the machine operators who were incumbent to an incentive machine, U.S. Steel agreed to look back at their past six pay periods and pay them their average incentive rate earned over that period.  Each incumbent had his own personal incentive rate.  U.S. Steel also agreed to pay a fill-in during a temporary vacancy a machine incentive rate that was calculated by taking the average incentive rates that were earned previously on a machine.  Machinists who wished to fill-in on a machine during a temporary vacancy had to bid on the assignment.  Seniority was used to determine who would be assigned.  The 319 bar machine and 325 bar machine had the highest incentive rates that could be earned by fill-ins (376%).  The incentive rates on other machines ranged from 306% to 375%.  The 1040 slotter, which was the machine that Gray typically ran, had a position incentive rate of 341%.

While employed at U.S. Steel, Gray was a member of the United Steel workers Union and its Local Union 1014.  The USW and Local 1014 had exclusive representation of bargaining unit employees working in production and maintenance at U.S. Steel's facilities.   The terms and conditions of employment for production and maintenance employees at U.S. Steel were governed by a Basic Labor Agreement (BLA), which was renegotiated in 2003 and 2008.

In 2003, U.S. Steel and USW agreed to restructure the entire job classification system for

all production and bargaining unit employees.  The 2003 BLA condensed the positions down to six with very broad job descriptions.  It eliminated incumbency to a specific machine and allowed bargaining unit employees to perform multiple tasks within their new job description. As a result, all machinists in the Machine Shop, including Gray, were classified as MTMs and were paid at a Labor Grade 4 base rate of pay.  U.S. Steel explained that management now could move employees to different job assignments within a position regardless of seniority and could assign a broad array of tasks as set forth in the BLA.  For the machine shop, this meant that management could assign MTMs in that unit to any of the floor assembly areas, to perform field work, or to any of the machines falling under the MTM job umbrella.  The BLA provided that promotions would be considered based on physical ability to perform the work and plant continuous service.  Under the new agreement, the job assignments in the machine shop were all MTM Labor Grade 4 positions and transfer among them was not a promotion.

When the 2003 BLA took effect, U.S. Steel set the incentive rates for the former machine incumbents and the machine fill-ins at 221%.  The change in the incentive rate gave rise to a grievance by the machinists who had their own personal incentive rates.  U.S. Steel and USW agreed that bargaining unit employees who held incumbency on the incentive machines prior to May 20, 2003, would receive a fixed hourly rate equivalent to their old personal incentive rates. This allowed the employees to earn these wages regardless of what incentive machine they operated or what job they performed in the Machine Shop.  All other bargaining unit employees in the machine shop without incumbency to the incentive machines, including Gray, would earn a fixed incentive rate of 221% when filling in on any incentive machine.

Numerous grievances concerning U.S. Steel's ability to assign MTMs to various

assignments in the Machine Shop, incentive rates, overtime distribution, and vacation pay arose from the 2003 BLA. U.S. Steel negotiated with Joe Jarzabkowski, the USW Local 1014 Chairman, to settle the 28 grievances. A settlement was reached on August 8, 2007. The parties agreed to a 185% uniform incentive rate. When the incentive rate was combined with the base rate of pay, this translated into a regular rate of pay of $28.95 an hour for MTMs in the Machine Shop. The memorandum of agreement (MOA) exempted certain MTMs from the 185% and stated that they would be paid an increased flat hourly rate.

Gray, Pat Lobdell, James Hale, and Art Warchus were exempted and given the highest rate of $40.00 an hour, and R. Scott Swenton was assigned $30.44 an hour. The hourly rate of $40.00 an hour was equivalent to an incentive rate of 344%. The MOA also stated that U.S. Steel would pay a lump sum of $125,000 in two installments but that Local 1014 would provide the breakdown to U.S. Steel regarding how the funds would be distributed among the affected employees. Although Lobdell had filed his grievances after Gray and had filed fewer grievances, Jarzabkowski suggested that Gray and Lobdell get $30,000 each. Gray agreed to the settlement. However, he subsequently calculated his losses to total $200,000 because he was not permitted to run the 319 bar machine and lost 8-12 hours per week in overtime.

Prior to the distribution of the lump sum payment, U.S. Steel and Local 1014 agreed to amend the MOA. The addendum changed the rates for four of the employees, but not Gray. Because U.S. Steel would be paying increased rates to more employees than anticipated in the first MOA, the parties agreed that U.S. Steel only would pay out $62,000. U.S. Steel began paying the higher rates immediately. Gray received $40 an hour whether he worked on the machines or in any other area of the Machine Shop. Other than the remaining handful of former

machine incumbents still working in the Machine Shop, Gray and Lobdell were the highest paid MTMs in the Machine Shop.

In August 2007, Jarzabkowski informed Gray that he would be receiving $30,000 from U.S. Steel. He later told Gray that the money would be delayed because there was discord among the Machine Shop employees concerning the terms of the MOA and its Addendum. Local 1014 eventually filed a new grievance challenging the legality of the MOA and Addendum. Because of the new grievance and many objections to the MOA and Addendum, U.S. Steel did not make the $62,000 payment. U.S. Steel and Local 1014 reached an agreement and finalized a new MOA in August 2011 to settle the grievance challenging the MOA and Addendum. In 2011, U.S. Steel paid the $62,000, including $30,000 to Gray.

Over the course of the settlement process, Gray complains that the Union failed to represent his best interests because it did not allow him to remove his grievance from the global settlement group, although it allowed a Caucasian, non-disabled employee, Jeff Carden, to remove his; it did not negotiate a proper settlement on his behalf; and it failed to communicate with him about the status of his grievances. Although Carden's grievance was separated from the mass settlement, it was not taken to arbitration, and Carden received a smaller settlement than Gray. Carden told Gray that the Union had settled his grievance, but the Union and U.S. Steel would not confirm this information. Joe Jarzabkowski, also Caucasian and non-disabled, told Gray that he could not explain the situation and referred him to Alexander Jacque, who then referred Gray to Mike Milsap. Milsap refused to meet with Gray despite his numerous requests.

Gray further states that the Union failed to communicate with him concerning his grievance because it held meetings with the other employees who were part of the global

5

settlement agreement regarding the status of their grievances but would not meet with him. The Union reports that the plant chairman met with Gray regarding his grievances in July, August, September, and twice in October. Gray also complained that the Union held a meeting in September but that he was advised not to come. However, the Union states that the September meeting was called by the employees, not the Union, and even if he was discouraged from attending, Gray was not denied entry, particularly not by anyone from the Union.

Gray's grievances arose from his job assignment, pay, and overtime assignments. Gray worked in the East Floor Assembly Area, but he was assigned to the 1040 slotter machine almost daily because Bob Martin, who previously was awarded incumbency to the 1040 slotter machine pre-2003, took a special assignment. Gray wanted to work on the 319 bar machine for a number of years. However, Swenton had been assigned to the machine in the 1990s. Gray thought that he should have been reassigned to the 319 machine because he had more seniority than Swenton. Gray's supervisor, Ed Lipinski, saw no reason to move Swenton from the 319 machine because he was very efficient and could keep up with the flow of work. Gray agreed that Swenton was better at running the 319 machine.

When the employee operating the 325 bar machine retired, Lipinski asked Gray if he wanted the assignment. Gray declined and stated that he wanted to operate the 319 machine instead. Gray believed the 325 bar machine required too much standing. Lipinkski gave the assignment to Carden. He also trained Swenton to operate the 325 bar machine so he could fill in. Gray found this decision discriminatory because he had agreed to fill in on any machine during a temporary absence and already had been trained on the 325 bar machine.

The 2003 BLA stated that management would assign work according to seniority. The

agreement further stated that where machinists have been fully trained, the employees could select their preferences to repetitive routine assignments on the basis of seniority. Lipinkski admitted that he used seniority, ability, and safety as the factors to consider who would fill in on a machine. Lipinski used seniority as one factor when assigning Jim Hale to the 287 Lathe Machine in 2008 and Carden to the 325 bar machine in 2008, but he stated that seniority was not a factor in refusing to allow Gray to run the 319 bar machine and routinely assigning Swenton since 2003.

Gray claimed that between 2003 and 2006 Lipinski and his predecessor, Bob Kolbert, made statements that implied that Gray could not handle the stress of the 319 bar machine like Swenton and that Gray was mentally unbalanced or unstable. Gray later clarified this and said that Kolbert made one statement or innuendo about the stress of working the 319 bar machine, and that Lipinski reiterated in 2006 that it was a stressful machine, that he did not have to make assignments based on seniority, and that he felt that Swenton was better able to handle the 319 machine. Gray complains that Kolbert, Bob Vazquez, Martin, and Lipinski all made comments regarding his mental state of mind as not being capable of handling stress. Gray claims that he was perceived as being unable to handle stress after a verbal altercation with a co-worker, Larry Daley, in 2000, after which it was alleged that Gray was acting unstable and ranting and raving.

In November 2004, Gray brought in a document from his doctor which stated that he was restricted to only 8 hours of work a day. Gray had suffered anxiety attacks and bouts of depression since 1974 when he served in Vietnam. Gray also could not remain on his feet without swelling and complications with walking and balancing himself. U.S. Steel's medical department advised Gray's managers of this restriction. When less than 8 hours of overtime

were needed, the overtime was added on to the employee's regular shift, and he would be expected to stay on the job and continue working into the next shift. Because of his medical restriction, Gray was not offered weekday overtime. Weekend overtime was rare in the Machine Shop.

Gray first complained about not receiving weekend overtime in 2005. Gray reports that Paul Zonghetti and Ed Lipinski made it clear that they would not give him weekend overtime. In April 2007, Gray spoke to Zonghetti and explained that although he could not work by standing over eight hours, he could work overtime as long as he could sit from time to time. Zonghetti did not respond to Gray's request that he be permitted to work overtime on the weekends.

From October 1, 2007 through December 31, 2008, Swenton was given 4 days of weekend overtime, Whittemore was given 2 days, and Lopez was given 1 day. Gray complains that Swenton was given more overtime opportunities because he was assigned to the 319 machine. In July 2008, U.S. Steel asked Martin, the incumbent on the 1040 Slotter that Gray usually operated, to perform a job on a Sunday.

In 2008, the new BLA provided a minimum weekly work opportunity of 56 hours for employees working in the Maintenance Shops. This meant that MTMs could work an extra day. Lipinski informed Gray of the changes. Gray then was offered twelve overtime opportunities but declined eleven of them, including a Saturday.

Gray complained that U.S. Steel should have accommodated the problems he was having with his feet by assigning him to machines that did not require him to stand constantly, such as the 319 machine or the 1040 slotter. He admitted that U.S. Steel permitted him to sit when needed and that the floor assembly area had benches and chairs that MTMs could use for some

jobs.  He further admitted that there were many things to sit on in the shop and ample opportunities for him to sit down.  While he was operating the 1040 slotter, he had a chair right by his machine where he could sit and rest his feet.

Lipinski acknowledged that Gray had the ability to operate the 319 bar machine, but he saw no reason to move Swenton.  Gray further reports that some machinists did not want to fill in on other types of machines but that he agreed that he would fill in on any machine.  Gray complains that U.S. Steel refused to allow him to fill in on several machines, including the 319 bar machine.  Following the 2003 BLA, the managers sometimes filled vacancies by seniority, but other times did not.  Regardless, Gray identified another employee, Ray Novotny, who similarly had medical restrictions. Although Novotny experienced epileptic seizures while operating a milling machine, U.S. Steel did not remove him from the machine.  Therefore, Gray argues that because he had greater seniority and U.S. Steel allowed another employee who had a medical restriction to continue operating a machine, he likewise should have been allowed to operate the 319 machine.

Gray identified several other actions to support his claims of discrimination.  In 2000, Gray reported race discrimination by Larry Daley.  Gray and Daley were sent home, but Daley received a 2-day suspension and Gray received a 5-day suspension.  Likewise, in April 2009, Joe Zitch wrote Gray up for not wearing his shoes while he was on break, but he did not write up other non-African American employees who were not wearing their safety glasses or hats.  Mark Stanovich also issued Gray three 5-day suspensions for taking coffee into the work area while others who were caught sleeping on the job and were out of the area for fire watch were not suspended.

Gray previously filed a lawsuit against U.S. Steel for discrimination, but he was unsuccessful. Gray complains that U.S. Steel would not act on his complaints about lost earning opportunities following the loss of this lawsuit. Gray complains that Lipinkski thought that Gray's EEOC complaints were pathetic and that management had a hostile attitude towards him since his EEOC complaint and 2001 court case. Gray further contends that U.S. Steel retaliated against him following his prior lawsuit by holding off on the processing of his grievances, failing to give him his $30,000 settlement, not allowing him to run the 319 machine, and not giving him overtime.

On April 2, 2008, Gray filed a charge of discrimination with the Equal Employment Opportunity Commission. The charge complained of discrimination based on race and disability arising from events occurring between October 1, 2007 and March 13, 2008, and "continuing". Gray amended his charge to include a claim for retaliation. On January 7, 2009, Gray filed a second charge of discrimination based upon disability for events occurring between September 13, 2006 and September 13, 2008.

Gray received his notice of right to sue and filed the present lawsuit on October 5, 2009, raising the following counts against U.S. Steel: racial discrimination arising from disparate treatment and a hostile work environment in violation of Title VII and the Civil Rights Act of 1991; disability discrimination in violation of the Americans with Disabilities Act arising from disparate treatment, being regarded as disabled, and disparate impact; and retaliation in violation of Title VII, the ADA and the Civil Rights Act of 1991. Gray also alleged that the Union discriminated against him based upon his race and disability and breached its duty of fair representation.

*Discussion*

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is proper only if it is demonstrated that "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548 , 91 L. Ed. 2d 265 (1986); *Kidwell v. Eisenhauer,* 679 F.3d 957, 964 (7th Cir. 2012); *Stephens v. Erickson,* 569 F.3d 779, 786 (7th Cir. 2009). The burden is upon the moving party to establish that no material facts are in genuine dispute, and any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 160, 90 S. Ct. 1598, 1610, 26 L. Ed.2d 142, 155 (1970); *Stephens*, 569 F.3d at 786. A fact is material if it is outcome determinative under applicable law. There must be evidence on which the jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986); *Stephens*, 569 F.3d at 786; *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). However, summary judgment may be entered against the non-moving party if it is unable to "establish the existence of an essential element to [the party's] case, and on which [that party] will bear the burden of proof at trial . . .". *Kidwell*, 679 F.3d at 964 (citing *Benuzzi v. Bd. of Educ*., 647 F.3d 652, 662 (7th Cir. 2011) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Summary judgment is inappropriate for determination of claims in which issues of intent, good faith, and other subjective feelings play dominant roles. *Ashman v. Barrows,* 438 F.3d 781, 784 (7th Cir. 2006). Upon review, the court does not evaluate the weight of the evidence, judge the credibility of witnesses, or determine the ultimate truth of the matter; rather, the court

will determine whether there exists a genuine issue of triable fact. *Wheeler*, 539 F.3d at 634

(citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L.Ed.2d

202, 212 (1986)).

In deciding a motion for summary judgment, the trial court must determine whether the

evidence presented by the party opposed to the summary judgment is such that a reasonable jury

might find in favor of that party after a trial.

> The inquiry performed is the threshold inquiry of determining
> whether there is the need for a trial--whether, in other words, there
> are any genuine factual issues that properly can be resolved only by
> a finder of fact because they may reasonably be resolved in favor of
> either party.
>
> [T]his standard mirrors the standard for a directed verdict under
> Federal Rule of Civil Procedure 50(a), which is that the trial judge
> must direct a verdict if, under the governing law, there can be but one
> reasonable conclusion as to the verdict.
>
> *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250, 106 S. Ct. 2505,
> 2511, 91 L.Ed.2d 202, 212 (1986).

*See also* *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 149-51, 120 S.Ct. 2097,

2109, 147 L. Ed.2d 105, 120-22 (2000) (setting out the standard for a directed verdict); *Celotex*

*Corp*., 477 U.S. at 322-23, 106 S. Ct. at 2553; *Stephens,* 569 F.3d at 786; *Argyropoulos v. City*

*of Alton*, 539 F.3d 724, 732 (7th Cir. 2008)(stating that a genuine issue is one on which a

reasonable fact finder could find for the nonmoving party); *Springer v. Durflinger,* 518 F.3d

479, 483 (7th Cir. 2008)(stating that a genuine issue exists and summary judgment is

inappropriate if there is sufficient evidence for a jury to return a verdict for the nonmoving

party). Gray raised the following counts against U.S. Steel: racial discrimination arising from

disparate treatment and a hostile work environment in violation of Title VII and the Civil Rights

Act of 1991; disability discrimination in violation of the Americans with Disabilities Act arising from disparate treatment, being regarded as disabled, and disparate impact; and retaliation in violation of Title VII, the ADA and the Civil Rights Act of 1991. Gray also alleged that Local 1014 discriminated against him based upon his race and disability and breached its duty of fair representation.

Because Gray's complaints arise under different statutes— Title VII of the Civil Rights Act, the Americans With Disabilities Act (ADA), the Civil Rights Act of 1991, and the Labor Management Relations Act (LMRA)— there are different statutes of limitations at play. First, Title VII covers two types of employment discrimination, including discrete acts and acts that create a hostile workplace. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114-115, 122 S.Ct. 2061, 2073, 153 L.Ed.2d 106 (2002). *See also* *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 683 (7th Cir. 2010). Discrete acts include "termination, failure to promote, denial of transfer, or refusal to hire, are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice." *National R.R. Passenger Corp.*, 536 U.S. at 114, 122 S.Ct. at 2073. Title 42 U.S.C. § 20003-5(e)(1) provides that a charge of discrimination arising from discrete acts must be filed within 300 days of the act in states that have a state agency authorized to mandate relief when a violation is found, or within 180 days otherwise. Indiana is a deferral state, rendering the charge of discrimination due within 300 days of the occurrence of the act. *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 445 (7th Cir. 1994). An unlawful practice is said to have occurred on the date of the discrete act that caused the loss that led to the party filing a charge with the EEOC. *National R.R. Passenger Corp.*, 536 U.S. at 110-111, 122 S.Ct. at 2061.

Acts that create a hostile workplace are different from discrete acts because their nature involves repeated conduct, and they occur as part of a series, which can be span over an amount of days, months, or years. "[A] single act of harassment may not be actionable on its own." ***National R.R. Passenger Corp***., 536 U.S. at 115, 122 S.Ct. at 2073. The time for filing only requires that a plaintiff file her charge within a certain number of days after an unlawful practice has occurred. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability. ***National R.R. Passenger Corp.***, 536 U.S. at 117, 122 S.Ct at 2074. *See also **Vance v. Ball State University***, 646 F.3d 461, 468 (7th Cir. 2011) (noting that "[w]hen a plaintiff initiates a hostile work environment lawsuit, as opposed to a suit claiming discrimination based on discrete acts, she usually complains of an employer's continuing violation of Title VII 'based on the cumulative effect of individual acts.'").

Claims brought under the Americans with Disabilities Act are subject to the same statute of limitations as claims filed under Title VII. ***Elliott v. Dedelow***, 115 Fed. Appx. 881, 883 (7th Cir. 2004). Under both statutes, after a charge is filed, the EEOC either will choose to pursue the claim on the plaintiff's behalf or will issue a Dismissal and Notice of the Right to Sue. **42 U.S.C. § 2000e-5.** If the EEOC dismisses the claim, the plaintiff has 90 days from receipt of the Notice to file a complaint with the appropriate court. **42 U.S.C. § 2000e-5.** The 90 day limitation is not a jurisdictional prerequisite, rather, it operates as a condition precedent, similar to a statute of limitations. ***Perkins v. Silverstein***, 939 F.2d 463, 469 (7th Cir. 1991). The 90 days begins to run when the plaintiff or his attorney has actual receipt of the Notice. ***Thread-gill v. Moore U.S.A., Inc***., 269 F.3d 848, 850 (7th Cir. 2001). A complaint filed after the 90 days is time-barred and

subject to dismissal. ***Dandy v. United Parcel Service, Inc***., 388 F.3d 263, 270 (7th Cir. 2004).

Because a plaintiff must exhaust his administrative remedies prior to filing his complaint, Gray is limited to pursuing the claims listed in his charge of discrimination and those closely related.  *See **Cheek v. Western and Southern Life Ins. Co.***, 31 F.3d 497, 500 (7th Cir. 1994).  In his 2008 charge of discrimination, Gray complained that he was not allowed to work the 319 machine at the incumbent rate of pay, that he was not assigned to work the 319 machine despite having more seniority than the employee assigned to the machine, that management and the Union took a Caucasian worker's grievance to arbitration but did not take Gray's, that he was denied vacation pay, overtime, pay raises, and incentive pay, and that he was retaliated against.

With regard to Gray's complaint that he was not assigned to work the 319 machine despite having greater seniority, Swenton's assignment to the machine was a discrete act.  The decision was made at one specific point in time, similar to a decision to transfer or promote, and was not the product of a series of ongoing discriminatory decisions.  The decision not to reverse an adverse discrete decision is not a fresh act of discrimination.  ***Williamson v. Indiana University***, 345 F.3d 459, 463 (7th Cir. 2003); ***Lever v. Northwestern University***, 979 F.2d 552, 556 (7th Cir. 1992).  Because the decision to assign Swenton to the 319 machine was made in the 1990s, it occurred outside the statute of limitations.  Therefore, Gray's claim that he was discriminated against because he was not assigned to the 319 machine is time barred.

Moreover, even if the court found that U.S. Steel had an ongoing obligation to transfer employees to their preferred machine based on their seniority under the terms of the old BLA, the BLA was renegotiated in 2003, relieving U.S. Steel of this obligation.  Under the new agreement, the job assignments in the machine shop were all MTM Labor Grade 4 positions, and

transfer among them was not a promotion. Therefore, the 2003 BLA provisions relating to promotions and temporary vacancies involving promotions within a seniority unit did not apply. Under the new BLA, U.S. Steel was not required to consider seniority when making assignments, and all of the positions earned the same incentive rate. For this reason, U.S. Steel did not engage in an ongoing series of discriminatory decisions by failing to re-assign Gray to the 319 machine after the BLA was renegotiated. Again, Gray knew when the BLA was renegotiated in 2003 that Swenton would continue to operate the 319 machine under the terms of the new BLA. However, Gray did not file his charge of discrimination until 2008. This is well past the expiration of the statute of limitations under Title VII and the ADA.

The renegotiated BLA also set the incentive pay at the same rate for all of the machines. Gray complains that he was not allowed to operate the 319 machine at the incumbent rate of pay, which was historically higher. Because the rates were made consistent in 2003, his claim that he was assigned to a machine with a lower incentive rate arose prior to the date the 2003 BLA was entered and is time barred. Moreover, Gray agreed to a flat hourly rate and no longer earned incentive pay. Irrespective of what position in the machine shop Gray worked, he eared $40 an hour, the most of any employee in the machine shop.

Gray's claims that he was discriminated against because he was not assigned to the 319 machine and was not paid at the incumbent rate fair no better under 42 U.S.C. § 1981. Section 1981 has a four year statute of limitations for filing a complaint based on race discrimination. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 372, 124 S.Ct. 1836, 1839, 158 L.Ed.2d 645 (2004); **28 U.S.C. § 1658(a)**. However, Gray's claim came to fruition no later than 2003, when the BLA was renegotiated. Because Gray did not file his complaint until 2009, after the statute

of limitations expired, Gray cannot use this event as evidence of a discrete act of discrimination.

In his 2009 EEOC charge, Gray complained that U.S. Steel failed to assign him overtime work on weekdays and weekends from September 13, 2006 to September 13, 2008. The charge was filed on January 7, 2009, making any claims before March 13, 2008 time barred under Title VII. U.S. Steel argues that the entire claim is time barred because Gray admitted that he knew his managers were under the impression that his medical restriction barred him from overtime as early as 2004 when he presented a note from his doctor, and because he was denied overtime as an accommodation for his disability, as perceived, the adoption of the accommodation policy triggered the statute of limitations. *See **EEOC v. RR Donnelley & Sons, Inc**., 792 F.Supp. 46, 58 (S.D. Ind. 1992).

The court does not agree that this claim is barred in its entirety. The record suggests that U.S. Steel was aware that Gray could work overtime on weekends. In 2005, Gray informed his supervisors that he could work overtime if he was able to sit. Moreover, U.S. Steel offered Gray overtime on several occasions beginning in 2008, most of which he declined. Additionally, U.S. Steel knew that Gray could work weekend overtime before he spoke with them. The record shows that other employees outside the protected class were offered weekend overtime during the relevant time frame, which Gray was eligible to do. Therefore, this portion of his claim is not time barred and must be assessed on the merits.

U.S. Steel next argues that Gray's disparate impact claim under the ADA was not filed with the EEOC. U.S. Steel points out that a disparate impact claim does not require a showing of discriminatory intent. Rather, it requires statistical correlation evidence which demonstrates that a specific practice has a disproportionately negative effect on the plaintiff's protected class.

*Noreuil v. Peabody Coal Co.*, 96 F.3d 254, 258 (7th Cir. 1996). Gray does not dispute that he failed to include this claim in his EEOC charge. Nor does Gray provide any evidence in support of this argument. Any argument not raised in response is considered waived. ***Hernandez v. Cook County Sheriff's Office***, 634 F.3d 906, 913 (7th Cir. 2011); ***Palmer v. Marion County,*** 327 F.3d 588, 597 (7th Cir. 2003); ***Laborers' Intern. Union of North America v. Caruso***, 197 F.3d 1195, 1197 (7th Cir. 1999); ***Wright v. United States***, 139 F.3d 551, 553 (7th Cir. 1998). For this reason, U.S. Steel's motion is **GRANTED** on this issue.

Gray's first complaint is that U.S. Steel discriminated against him based on his race and subjected him to disparate treatment and a hostile environment. Although some of his complaints are time barred, as explained above, Gray's claims that he was subject to a hostile environment and denied overtime remain pending.

Title VII of the Civil Rights Act prohibits discrimination in employment because of an individual's race. 42 U.S.C. §2000e-2(a)(1). Section 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State . . . to make and enforce contracts . . . as is enjoyed by white citizens [and this right includes] the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

> 42 U.S.C. §1981(a)-(b), as amended by the Civil Rights Act of 1991.

Title VII and Section 1981 claims require an equivalent analysis. *See **Williams v. Waste Management of Illinois, Inc**.*, 361 F.3d 1021, 1028 (7th Cir. 2004); ***Cerutti v. BASF Corporation***, 349 F.3d 1055, 1060 n.4 (7th Cir. 2003); ***Walker v. Abbott Laboratories***, 340 F.3d 471, 474 (7th Cir. 2003) (noting that Title VII and section 1981 cases have similar liability standards but different available remedies). Motions for summary judgment in employment

discrimination cases are treated like any other motion for summary judgment. *Alexander v. Wisconsin Department of Health and Family Services*, 263 F.3d 673, 681 (7th Cir. 2001); *Wohl v. Spectrum Manufacturing, Inc.*, 94 F.3d 353, 355 n.1 (7th Cir. 1996).

In a Title VII and Section 1981 case, a plaintiff can prove discrimination by direct evidence of discriminatory intent or, where no direct evidence exists, by using the indirect-burden shifting method established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-805, 93 S. Ct. 1817, 1824-1825, 36 L. Ed.2d 668 (1973), and refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S.248, 253, 101 S.Ct. 1089, 1092, 67 L.Ed.2d 207 (1981); *Williams*, 361 F.3d at 1034; *Dandy v. United Parcel Service, Inc*., 388 F.3d 263, 272 (7th Cir. 2004). Under the direct method, the plaintiff "must show either 'an acknowledgment of discriminatory intent by the defendant or circumstantial evidence that provides the basis for an inference of intentional discrimination.'" *See Dandy*, 388 F.3d at 272 (7th Cir. 2004) (*quoting Gorence v. Eagle Food Centers*, 242 F.3d 759, 762 (7th Cir. 2001)); *Rhodes v. Illinois Department of Transportation*, 359 F.3d 498, 504 (7th Cir. 2004); *Adams v. Wal-Mart Stores*, *Inc*., 324 F.3d 935, 938-39 (7th Cir. 2003). Circumstantial evidence, by contrast, must create a "'convincing mosaic'" that "'allows the jury to infer intentional discrimination by the decision maker'" and points directly to a discriminatory reason for the employment decision. *Rhodes*, 359 F.3d at 504 (*quoting Troupe v. May Department Stores Company*, 20 F.3d 734, 737 (7th Cir. 1994)); *Adams*, 324 F.3d at 939.

The most general statement of the *McDonnell-Douglas* method of proof is that the plaintiff has the initial burden of showing that: 1) he belongs to a protected group; 2) he was performing to the employer's legitimate expectations; 3) he suffered an adverse employment

decision; and 4) the employer treated similarly situated employees who are not in the protected group more favorably. ***Davis v. Con-Way Transportation Central Express, Inc.***, 368 F.3d 776, 788 (7th Cir. 2004); ***Wells v. Unisource Worldwide, Inc***., 289 F.3d 1001, 1006 (7th Cir. 2002). This framework is flexible and may be adapted to fit each case. ***Burdine***, 450 U.S. at 253 n.6, 101 S. Ct. at 1094 n.6; ***Wohl***, 93 F.3d at 359. However, this method has been called into question by the Seventh Circuit in favor of a more straightforward method. The Seventh Circuit has proposed that the court make the following inquiry: "is the plaintiff in a class protected by the statute; has he suffered a harm; and could a rational jury find the latter resulted from the former." ***Shreeve v. D.O. McComb & Sons, Inc***., 2013 WL 5707196, *5 (N.D. Ind. Oct. 21, 2013) (citing ***Hitchcock***, 718 F.3d at 737 (7th Cir. 2013) (citing ***Coleman***, 667 F.3d at 863 (7th Cir. 2012) (Wood, J., concurring)).

Once the plaintiff has met this initial burden, the burden shifts to the defendant who must "articulate a legitimate, nondiscriminatory reason for its actions." ***Herron v. DaimlerChrysler Corporation***, 388 F.3d 293, 299 (7th Cir. 2004); ***Johnson v. Cambridge Industries, Inc***., 325 F.3d 892, 897 (7th Cir. 2003). The defendant's burden is not one of persuasion, but rather of production and "can involve no credibility assessment." ***St. Mary's Honor Center v. Hicks***, 509 U.S. 502, 509, 113 S. Ct. 2742, 2748, 125 L. Ed.2d 407 (1993); ***See also Reeves v. Sanderson Plumbing Products, Inc***., 530 U.S. 130, 142, 120 S. Ct. 2099, 2106, 147 L. Ed.2d 105 (2000).

The burden then shifts back to the plaintiff to show by a preponderance of the evidence that the reason given by the defendant is just a pretext for discrimination. *See* ***Jordan v. City of Gary***, 396 F.3d 825, 834 (7th Cir. 2005); ***Volvosek v. Wisconsin Department of Agriculture, Trade and Consumer Protection***, 344 F.3d 680, 692 (7th Cir. 2003); ***Peters v. Renaissance***

*Hotel Operating Company*, 307 F.3d 535, 545 (7th Cir. 2002). The plaintiff cannot establish pretext merely by showing that the "reason was doubtful or mistaken." ***Crim v. Board of Education of Cairo School District No. 1***, 147 F.3d 535, 541 (7th Cir. 1998); *See also **Rummery v. Illinois Bell Telephone Company***, 250 F.3d 553, 557 (7th Cir. 2001). Rather, the plaintiff must show that the employer is lying or that the employer's reasoning has no basis in fact. ***Lesch v. Crown Cork & Seal Company***, 282 F.3d 467, 473 (7th Cir. 2002); *See also **Schuster v. Lucent Technologies, Inc.***, 327 F.3d 569, 574-76 (7th Cir. 2003). The trier of fact still may consider the evidence establishing a plaintiff's prima facie case and inferences properly drawn therefrom on the issue of whether a defendant's explanation is pretextual. ***Reeves***, 530 U.S. at 143, 120 S. Ct. 2106.

Despite the shifting burden of production, the ultimate burden of persuasion remains at all times with the plaintiff. ***St. Mary's Honor Center***, 509 U.S. at 507, 113 S. Ct. at 2747; ***Burdine***, 450 U.S. at 254, 101 S. Ct. at 1094; ***Johnson***, 325 F.3d at 897. A plaintiff alleging discrimination, however, has a lesser burden when proceeding on a summary judgment motion. In ***Anderson v. Baxter Healthcare Corp.***, 13 F.3d 1120 (7th Cir. 1994), the Seventh Circuit stated:

> Both ***McDonnell Douglas*** and [***St. Mary's Honor Center v. Hicks***, 509 U.S. at 507, 113 S.Ct. at 2747] speak to the burden the plaintiff bears at trial. However, for summary judgment purposes, the nonmoving party, in this case the plaintiff, has a lesser burden. He must only "produce evidence from which a rational fact-finder could infer that the company lied" about its proffered reasons for dismissal.
>
> 13 F.3d at 1124 (*quoting **Shager v. Upjohn***, 913 F.2d 398, 401 (7th Cir. 1994));

*See also **O'Neal v. City of New Albany***, 293 F.3d 998, 1005 (7th Cir. 2002); ***Alexander v.***

***Wisconsin Department of Health and Family Services***, 263 F.3d 673, 683 (7th Cir. 2001) (stating that evidence that calls into question the truthfulness of the employer precludes summary judgment). If the plaintiff is unable to meet his burden, his claims must fail.

Gray was a member of a protected class who was performing at his employer's legitimate employment expectations. The parties dispute whether he suffered an adverse employment action and whether similarly situated employees were treated more favorably.

"[F]or purposes of Title VII, there are three general categories of actionable, materially adverse employment actions: (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment." ***Nagle v. Village of Calumet Park***, 554 F.3d 1106, 1116 (7th Cir. 2009).

U.S. Steel argues that Gray has failed to show that he suffered an adverse employment action because he cannot show that he suffered any financial loss, there was no financial gain in working one machine over another, and he was not subjected to a humiliating, degrading unsafe, unhealthful, or significantly negative alteration in his work environment. The court agrees that there was no financial benefit to working one machine over another and that Gray's assignment was not negatively altered in any way. In fact, Gray was the highest paid employee in the

machine shop, and he admitted that the mangers preferred to have Swenton run the 319 machine because he was best on that machine. Therefore, even if his claim that he was discriminated against because he was not assigned to the 319 machine despite having greater seniority was not time barred, he has not shown that the assignment was an adverse employment action.

However, the record reveals that Gray was not assigned weekend overtime that was made available to employees with less seniority, which resulted in decreased pay. U.S. Steel argues that the amount of overtime worked by other employees in the machine shop was negligible. Over the relevant period, Swenton was given four weekend overtime days to run the 319 machine. In June 2008, U.S. Steel allowed Swenton to fill in on the 326 computer bar machine. Although Gray already had training on machine, he was not asked to run the machine. That following July, Bob Martin, a Caucasian, non-disabled employee was called in on a weekend to work the 1040 slotter, the machine to which Gray had been assigned. Gray was not offered this overtime. Because weekend overtime was made available to employees outside the protected class on machines Gray knew how to run, he has shown that he suffered an adverse employment action.

However, this does not end the inquiry. Gray has demonstrated that the overtime assignments were given to employees outside the protected class, although it is not clear that the employees were similarly situated. This analysis seemingly overlaps with U.S. Steel's justification for how it assigned overtime. U.S. Steel stated that Swenton was more efficient at operating the 319 machine, and that it offered him the weekend overtime on the 319 machine for this reason. Gray admitted that it was his understanding that Swenton was assigned to the 319 machine because he was better at running the machine, which suggests that they were not

similarly situated. Moreover, Gray has not submitted any evidence to show that U.S. Steel's explanation was a pretext for U.S. Steel's discriminatory intent. Additionally, Gray has not shown that seniority was always the deciding factor or that seniority was used to displace others from machines that they had been operating for two decades rather than as a factor used in determining who received a position when there was a vacancy. For these reasons, summary judgment must be awarded in favor of U.S. Steel on this issue.

Gray also complains that he was discriminated against because Swenton also was given training to run the 326 computer bar machine so he could fill in. However, it is not clear why Gray found this training to be discriminatory. Gray declined to take the permanent job on the 326 bar machine because of his health problems. Although he never declined to run the 326 machine as a fill-in, it is not clear what effect training Swenton had on Gray or his earnings. Gray continued to operate the 1040 slotter and would have earned the same pay regardless of his assignment within the machine shop. The record does not suggest that Swenton received overtime as a result of his training instead of Gray. Therefore, Gray did not lose any earnings by operating the 1040 slotter instead of the 326 bar machine.

Gray also identified Lobdell as a similarly situated employee who was treated more favorably, but he has not presented any evidence that Lobdell was offered weekend overtime. This leaves Gray's complaint that Martin was called in to work a weekend overtime over Gray one time. However, loss of one day's wages is not enough to constitute disparate treatment. *Rhodes v. Illinois Dept. of Transportation*, 359 F.3d 498, 505 (7th Cir. 2004) (explaining that loss of a single day's wages had only a negligible impact on the plaintiff's income and did not cause material harm). *See generally* **Williams v. Bristol-Myers Squibb Co.**, 85 F.3d 270, 274

(7th Cir. 1996) (explaining that a transfer that has the effect of reducing the employee's sales, and hence commissions, does not constitute a materially adverse action).

Overall, Gray has failed to establish a *prima facie* case that he was discriminated against. Gray has not demonstrated that the reason why U.S. Steel gave Swenton more overtime was a pretext for discrimination, nor has he shown that U.S. Steel assigned weekend overtime prior to offering it to Gray on more than one occasion. The sole instance of which he has submitted proof, Martin's single assignment to a weekend overtime shift, does not qualify as employment discrimination.

Gray also argues that he was subjected to discrimination because his grievance was not taken to arbitration. To begin, the decision to take a claim to arbitration is the Union's. U.S. Steel could not choose to arbitrate any claims against itself. Therefore, this complaint does not show that U.S. Steel engaged in discriminatory behavior, and Gray's claim cannot survive U.S. Steel's motion.

Gray also argues that the Union discriminated against him because of his race and disability. The standard for assessing racial discrimination by a union varies from that of an employer. A union has the duty to provide fair representation to its members both in negotiating the collective bargaining agreement and in attempting to implement its terms. The standard for establishing discrimination is the same as the standard for establishing a breach of the duty of fair representation. In ***Vaca v. Sipes***, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), the Supreme Court described the duty of fair representation:

> Under this doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.

386 U.S. at 177, 87 S.Ct. at 909–10

 *See also **United Steelworkers of America v. Rawson***, 495 U.S. 362, 372, 110 S.Ct. 1904, 1911, 109 L.Ed.2d 362 (1990); ***Breininger v. Sheet Metal Workers International Association Local Union No. 6***, 493 U.S. 67, 73, 110 S.Ct. 424, 429, 107 L.Ed.2d 388 (1989); and ***Thomas v. United Parcel Service, Inc.***, 890 F.2d 909, 921–22 (7ᵗʰ Cir. 1989).

 The Supreme Court has provided some limited guidance on what constitutes a breach of the duty of fair representation, explaining that a breach occurs "only when a Union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." ***Vaca***, 386 U.S. at 190, 87 S.Ct. at 916. In interpreting the ban on union conduct which is "arbitrary, discriminatory, or in bad faith," the Seventh Circuit previously required the plaintiff to demonstrate intentional misconduct by the union. ***Hoffman v. Lonza, Inc***., 658 F.2d 519 (7th Cir. 1981). However, the Supreme Court rejected this narrow reading of the duty of fair representation. ***Air Line Pilots Association International v. O'Neill***, 499 U.S. 65, 111 S.Ct. 1127, 1134-1135, 113 L.Ed.2d 51 (1991). Instead, the court must employ a three part test to determine whether the union acted honestly and in good faith. ***Ooley v. Schwitzer Div. Household Manufacturing, Inc***., 961 F.2d 1293, 1302 (7ᵗʰ Cir. 1992). "The three separate levels of inquiry under this standard are as follows: (1) did the union act arbitrarily; (2) did the union act discriminatorily; or (3) did the union act in bad faith." ***Ooley***, 961 F.2d at 1302 (citing ***O'Neill***, 499 U.S. at 71-77, 111 S.Ct. at 1132-1135).

 Gray argues that the Union acted arbitrarily, discriminatorily, and in bad faith because Carden's grievance was removed from the global settlement and handled separately, but his was not. However, this ignores that most grievances were handled in the group settlement, that Gray agreed to the settlement award, and that he received the highest pay increase and lump sum payment. "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at

the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness, 'as to be irrational.' " *O'Neill*, 499 U.S. at 67, 111 S.Ct. at 1130 (internal citations omitted). *See also* **Cleveland v. Porca Co.**, 38 F.3d 289, 295 (7th Cir. 1994). This is a deferential standard used to prevent the court from substituting its judgment for that of the union. **Neal v. Newspaper Holdings, Inc**., 349 F.3d 363, 369 (7th Cir. 2003).

Although Gray now argues that he would have received a higher settlement if his claim was arbitrated separately, because most of the grievances were settled together, Gray agreed to the settlement, and Gray received the highest award, no reasonable jury could find that the Union acted so far outside the bounds of reasonableness to warrant an award in Gray's favor. This is particularly true because Gray has made no effort to show why his grievances were worth more than the amount settled for. He has not argued that his grievances had greater merit to warrant an exceedingly different amount. Nor has he explained why he agreed to the settlement amount if it was so far outside the bounds of reasonableness.

Moreover, the union has the right to evaluate the merits of each grievance, and the union member does not have a right to have his grievance taken to arbitration. **Vaca,** 386 U.S. at 195; **Olsen,** 892 F.2d at 1296; and **Thomas**, 890 F.2d at 919. Therefore, even if the collective bargaining agreement provides for arbitration, a union does not breach its duty of fair representation merely because it has declined to process the grievance through the final stage. In **Vaca**, the Supreme Court concluded that since

> the individual employee has no absolute right to have his grievance arbitrated under the collective bargaining agreement . . . a breach of the duty of fair representation is not established merely by proof that the underlying grievance was meritorious . . .

386 U.S. at 195, 87 S.Ct. at 919

*See also* **Martin v. Youngstown Sheet & Tube Company**, 911 F.2d 1239, 1246 (7th Cir.1990); and **Dahnke**, 906 F.2d at 1196–97.

To show that the Union breached its duty of fair representation, Gray also would need to show that he "was actually harmed by the union's activities" and that "the outcome of the arbitration would probably have been different but for the union's activities." **Garcia,** 58 F.3d 1171, 1176 (7th Cir. 1995). Gray has not demonstrated that he actually was harmed by the Union's decision not to remove his claim. Although he now calculates a higher settlement amount, he has not demonstrated the basis or likelihood that he would have received this amount, or any amount higher than what he did receive. The Union has demonstrated that Gray agreed to the settlement and that he received a more favorable settlement than Carden. Therefore, he was not treated negatively, and summary judgment must be awarded to the Union on this issue.

Gray further contests that the Union acted discriminatorily and in bad faith because it did not negotiate the proper settlement on his behalf. He points to another employee outside his protected class, Lobdell, who was awarded an equivalent settlement. Gray believes this was discriminatory because he had filed more grievances than Lobdell and his grievances were filed at an earlier time. Again, Gray has submitted no proof that the Union's actions were done in bad faith or with a discriminatory motive. Gray agreed to the settlement and has not demonstrated that his grievances were worth more or were more meritorious than Lobdell's.

Finally, Gray complains that the Union withheld information from him concerning his grievances. He was advised not to come to a special union meeting in September or October of 2007 regarding the settlement because of a threat of violence. When he subsequently inquired

about the status of the settlement, the Union representative did not respond. Gray also complains that Local 1014 met with several members either separately or together between July and October 2007 to discuss their grievances and how they would be affected by the settlement. However, the evidence reveals that Gray had several conversations with the plant chairman. They discussed his grievances in July, August, September, and twice in October. Gray also talked to the USW International Representative during his period. Although Gray contests that the Union representatives met either separately or together with the individuals, the record reveals that they did the same with Gray. Gray has not shown that any other employees received more information about the status of their grievances than he did, and therefore he has failed to show that the Union acted in a discriminatory manner. The Union's actions do not display discriminatory conduct.

Gray further alleges that the Union excluded him from a meeting in violation of the Labor Management Reporting and Disclosure Act. The LMRDA was enacted "to protect union members in their relationship to the union by adopting measures to insure the provision of democratic processes in the conduct of union affairs and procedural due process to members subjected to discipline." *NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 194, 87 S.Ct. 2001, 2014, 18 L.Ed.2d 1123 (1967). Title 29 U.S.C. § 411(a)(1)-(2) states that "[e]very member of a labor organization shall have equal rights and privileges within such organization to . . . attend membership meetings . . . (2) Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions. . . ." Therefore, a union may incur liability when it excludes one of its members from its meetings.

Although Gray complains that the Union denied him entry to a meeting, Gray has failed to show that he in fact was excluded from a meeting held by the Union. Rather, the evidence suggests that the employees, not the Union, called a meeting in September 2007. Even if the meeting was organized by the Union, Gray does not claim that he was denied entry to the meeting. Rather, he only asserts that he was discouraged from attending. Moreover, to succeed on an LMRDA claim, there must be evidence of injury, and Gray has made no attempt to show how he was injured by the conduct. For these reasons, the court **GRANTS** summary judgment in favor of the Union because Gray has failed to show that the Union discriminated against him on the basis of his race or disability or breached its duty of fair representation.

Gray next complains that he was subjected to a hostile work environment. In support of his claim, Gray argues that the U.S. Steel machine shop was historically discriminatory and did not hired any African Americans from 1989 through at least 2009 when Gray retired. Gray then states that the 2003 BLA still required for U.S. Steel to consider seniority when making job assignments and that he was denied weekend overtime.

In *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986), the Supreme Court held that Title VII's prohibition against discrimination included conduct that had "the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *See also Harris v. Forklift Systems, Inc*., 510 U.S. 17, 22, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993); *McKenzie v. Illinois Department of Transportation*, 92 F.3d 473, 478 (7th Cir.1996). A hostile work environment is one in which the harassment is so severe or pervasive that it "alter[s] the conditions of the victim's employment and create[s] an abusive working environment."

*Oncale v. Sundowner Offshore Services, Incorporated*, 523 U.S. 75, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998) (quoting *Harris,* 510 U.S. at 21, 114 S.Ct. at 370); *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1143 (7th Cir. 1997). Whether a working environment is considered hostile depends on the totality of the circumstances. Factors to consider include

> the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Harris,* 510 U.S. at 23, 114 S.Ct. at 371.

To recover, an employee must show that: 1) he was subject to unwelcome harassment; 2) the harassment was based on his race; 3) the harassment was severe and pervasive so as to alter the conditions of the employee's environment and create a hostile or abusive working environment; and 4) there is a basis for employer liability. *See Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998). An employer is strictly liable for harassment caused by a supervisor. *Mason v. Southern Illinois University at Carbondale*, 223 F.3d 1036, 1043 (7th Cir. 2000). However, the employer's liability for a coworker's harassment is limited to situations where the employee can show that his employer has been negligent in discovering or remedying the harassment. *Mason*, 223 F.3d at 1043.

Gray made no attempt to show that U.S. Steel subjected him to the type of severe or pervasive environment that constitutes a hostile work environment because of his race. He has not pointed to one example of the type of conduct that would give rise to such an action. Rather, he states that the U.S. Steel machine shop had a history of being discriminatory and again points to the fact that U.S. Steel did not assign him to the 319 machine or assign him weekend overtime. The court has addressed these complaints above. The record does not show that these

events were severe, humiliating, or interfered with his employment, or that the any offensive or humiliating statements related to his race were made to Gray.

Gray also alleges that he was discriminated against because of his disability. The Americans with Disabilities Act ("ADA") prohibits discrimination against an individual based upon such person's disability. **42 U.S.C. § 12112(a).** An individual claiming protection must show that he is "disabled." **42 U.S.C. § 12112(a).** An individual is disabled within the meaning of the ADA when he suffers a physical or mental impairment that substantially limits one or more major life activities, has a record of such impairment, or is regarded as having such an impairment. **29 C.F.R. § 1630.2.** Major life activities include activities that a person generally does on a daily basis, including, but not limited to, "walking, seeing, hearing, speaking, breathing, learning, and working." **29 C.F.R. § 1630.2(i).** The court must make an individualized analysis to determine whether an individual's impairments "substantially limit" his "major life activities." ***E.E.O.C. v. Lee's Log Cabin, Inc.***, 546 F.3d 438, 442 (7th Cir. 2008).

The "regarded as" prong of the ADA's definition of disability addresses impairments that are not in fact disabling, but believed to be so. ***Krocka v. City of Chicago***, 203 F.3d 507, 513-14 (7th Cir. 2000); ***Brunker v. Schwan's Home Service, Inc***., 583 F.3d 1004, 1008 (7th Cir. 2009) ("Under a "regarded as" theory, the plaintiff must demonstrate either that (1) the employer mistakenly believes that the employee has an impairment that substantially limits a major life activity, or (2) the employer mistakenly believes that an existing impairment, which is not actually limiting, does substantially limit a major life activity"); ***Kotwica v. Rose Packing Company, Inc***., 637 F.3d 744, 748 (7th Cir. 2011). "The Supreme Court has noted that in order

to make out a claim under the "regarded as" prong, "it is necessary that a covered entity entertain misperceptions about the individual." ***Sutton v. United Airlines, Inc.,*** 527 U.S. 471, 489, 119 S.Ct. 2139, 2150, 144 L.Ed.2d 450 (1999). These misperceptions may take the form of believing "either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment, when, in fact, the impairment is not so limiting." ***Krocka***, 203 F.3d at 514.

After a defendant has established that he is disabled or regarded as such, he must show that he is qualified for the position in question. ***Hoffman v. Caterpillar, Inc***., 256 F.3d 568, 572 (7th Cir. 2001). A qualified person with a disability is someone who (1) has a disability but still satisfies the requisite skill, experience, education, and other job-related requirements of his employment position, and (2) can perform the essential functions of the position held or desired, with or without reasonable accommodation. **29 C.F.R. § 1630.2(m)**; ***Budde v. Kane County Forest Preserve***, 597 F.3d 860, 862 (7th Cir. 2010). Consideration is given to the employer's judgment as to what functions of the job are essential. **42 U.S. § 12111(8); *Jackson v. City of Chicago***, 414 F.3d 806, 811 (7th Cir. 2005). When an employee is unable to perform the essential functions of employment, the court must consider whether any reasonable accommodation for the disabled employee would help his perform the job. ***Amadio v. Ford Motor Company,*** 238 F.3d 919, 928 (7th Cir. 2001); *see* **42 U.S.C. § 12112(b)(5)(A)** (requiring the employer to make reasonable accommodations); *see also* **42 U.S.C. § 12111(9)** (defining "reasonable accommodation"). If any accommodation would place an "undue hardship" on the employer's business, the employer is not required to make the accommodation. ***Amadio***, 238 F.3d at 928; *see* **42 U.S.C. § 12112(b)(5)(A)** (providing that the employer does not have to

undertake accommodations that create an undue hardship); *see also* **42 U.S.C. § 12111(10)** (defining undue hardship).  In other words, an "unqualified" individual would be someone who could not do the job no matter what reasonable accommodations the employer made for that employee.  ***Filar v. Board of Education of City of Chicago***, 526 F.3d 1054, 1067 (7th Cir. 2008).

"Once a plaintiff has established that she is a qualified individual with a disability, she may show discrimination in either of two ways: by presenting evidence of disparate treatment or by showing a failure to accommodate." ***Hoffman***, 256 F.3d at 572 (*citing Sieberns v. Wal-Mart Stores, Inc*., 125 F.3d 1019, 1021-22 (7th Cir. 1997)).  In disparate treatment claims, the plaintiff may prove that he was treated differently than other workers on the basis of a protected characteristic either with direct evidence or indirectly using the ***McDonnell Douglas*** burden-shifting method. ***Hoffman***, 256 F.3d at 572 (*citing McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).  "In order to prevail in the absence of direct evidence, a plaintiff must first make out a prima facie case by showing that: (1) she is disabled within the meaning of the ADA; (2) she was meeting the legitimate employment expectations of her employer; (3) she suffered an adverse employment action; and (4) similarly situated employees received more favorable treatment." ***Hoffman***, 256 F.3d at 572.

In failure to accommodate cases, in addition to showing that he is a qualified disabled individual, the plaintiff must show that the employer was aware of his disability and failed to accommodate it. ***Ekstrand v. Sch. Dist. of Somerset***, 583 F.3d 972, 975 (7th Cir. 2009); ***King v. City of Madison***, 550 F.3d 598, 600 (7th Cir. 2008).  Reasonable accommodations may include:

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

**42 U.S.C. § 12111(9).** Disabled employees must make their employers aware of any nonobvious, medically necessary accommodations with corroborating evidence, such as a doctor's note or orally relaying a statement from a doctor, before the employer may be required under the ADA's standard of reasonableness to provide a specific modest accommodation to that employee. *Elkstrand*, 583 F.3d at 976. When analyzing whether the employer provided reasonable accommodations, the court must take into consideration the communications exchanged between the parties and look at who was responsible for the breakdown that occurred in any communications that involved accommodating the plaintiff's disability. *Elkstrand*, 583 F.3d at 975-76. When there is a communication breakdown, the court must "isolate the cause of the breakdown and then assign responsibility." *Elkstrand,* at 976.

Gray complains that he was subjected to disparate treatment because he had and was regarded as having a disability. Gray has pointed to many of the same events that formed the basis of his racial discrimination complaint to support his ADA claim. Specifically, in his first EEOC charge, Gray complained that U.S. Steel violated the ADA by refusing to assign him to the 319 machine and by treating his grievances different from other non-disabled employees. In his second EEOC charge, Gray stated that U.S. Steel violated the ADA by not allowing him to work overtime like other similarly situated employees.

Gray first explains that he was not permitted to operate the 319 machine because his supervisor, Ed Lipinski, thought Gray was too unstable because of his nervous/anxiety disorder.

Instead, Lipinski allowed Swenton, who had less seniority, to operate the machine. This complaint fails to establish disability discrimination for several reasons. One, as explained above, his complaint regarding Swenton's assignment to the 319 machine is time barred since it was decided in the 1990s that he would run the machine. Second, Gray did not show why Lipinski's decision not to assign Gray to the 319 machine was an adverse employment action. There was no financial incentive to operating this machine under the new BLA, and Gray has not explained why the conditions of running this machine were more favorable than the 1040 slotter machine or assembly to which he was assigned. Third, U.S. Steel accommodated Gray by making seating available to him and allowing him to sit when needed.

Gray further complains that the BLA still required assignments to be based on seniority, but he has failed to point to any similarly situated employee who was given an assignment he preferred and displaced someone because of seniority after the BLA was renegotiated in 2003. Gray did not suffer an adverse employment action simply because he did not get to run the machine he wanted to run.

In support of his argument, Gray states that U.S. Steel first offered a vacancy on the 325 bar machine to him despite knowing that he could not meet the physical demands of the machine. Gray argues that U.S. Steel's offer showed that seniority still was a consideration in giving assignments. However, this evidence is not as persuasive as Gray hopes. The offer to run the 325 bar machine was not made until a vacancy became available. This is different from displacing someone who had operated a machine since the 1990s. Perhaps U.S. Steel maintained a custom of offering vacancies based on seniority, but even so, the last time a vacancy was available on the 319 machine was in the 1990s and outside the statute of limitations.

Gray next argues that he was subjected to a hostile environment because management perceived him as having a mental disability. In support of his argument, Gray states that his supervisors made comments regarding his mental state of mind and his inability to handle stress, and stated that he was unbalanced or unstable. Gray also stated at his deposition that Lipinski and Zonghetti made it clear to him that they would not give him overtime although others in his group, who were Caucasian and not medically restricted, were earning six to twelve hours of overtime per week.

To the extent Gray intends to show that he was subjected to a hostile work environment based on this evidence, this Circuit has considered without deciding that an individual can bring a hostile environment claim under the ADA. *See Lloyd v. Swifty Transportation, Inc*., 552 F.3d 594, 603 (7th Cir. 2009); *Mannie v. Potter*, 394 F.3d 977, 982 (7th Cir. 2005). However, Gray did not state that he was subjected to a hostile work environment because of his disability in his EEOC charge, and claims that were not set forth in the EEOC charge cannot be addressed by the court unless they arose out of the same conduct. Rather, his 2009 EEOC charge was limited to complaints about being denied overtime. He did not refer to any severe or harassing statements or conduct that could have formed the basis of his hostile environment claim. Therefore, to the extent Gray intends to argue that he was subjected to a hostile environment on the basis of disability, his claim is barred for failure to raise it with the EEOC.

Although Gray may intend to use these statements to show that management perceived him as having a disability, their perception is immaterial if Gray did not suffer from an adverse employment action. Gray has not pointed to any actions within the statute of limitations that qualify. U.S. Steel's overtime policy was changed in 2008. After this time, Gray was offered

overtime on multiple occasions. Therefore, the court must consider the time preceding the change in the policy. During this time, Swenton was given several days of overtime, and Martin was called in to run the 1040 slotter on one occasion. Gray has not demonstrated that U.S. Steel discriminated against him by calling in Swenton to run the 319 bar machine. Swenton was assigned to the machine and was better at running the machine. Gray has not demonstrated that U.S. Steel customarily used seniority to determine who received weekend overtime on machines that the individual with greater seniority ordinarily did not operate, nor has he shown that U.S. Steel's reason was a pretext for discrimination. Moreover, Gray cannot now claim discrimination based on the single time Martin, the incumbent on the machine to which Gray was assigned, was called in to work weekend overtime in place of Gray. The record does not reflect that Gray was denied any opportunities.

Gray also alleges that he was retaliated against for filing a prior lawsuit and grievances against U.S. Steel. Title VII's separate antiretaliation provision "seeks to prevent harm to individuals based on what they do, i.e., their conduct." ***Burlington Northern***, 548 U.S. at 63, 126 S.Ct. at 2412. Unlawful retaliation in violation of Title VII occurs "when an employer takes actions that discriminate against an employee because she has opposed a practice that Title VII forbids", or "'testified, assisted, or participated in' a Title VII proceeding or investigation." **42 U.S.C. § 2000e-3(a)**. *See also*, ***Hicks v. Forest Preserve District of Cook County, Illinois***, 677 F.3d 781, 787 (7th Cir. 2012); ***Kampmier v. Emeritus Corp***, 472 F.3d 930, 939 (7th Cir. 2007)(internal quotations omitted) ( *citing* ***Burlington N. & Santa Fe Ry. Co. v. White***, 548 U.S. 53, 59, 126 S.Ct. 2405, 2410, 165 L.Ed.2d 345 (2006)). An employer effectively retaliates against an employee "by taking actions not directly related to [ ] employment or by causing [ ]

harm outside the workplace."*Burlington N*., 548 U.S. at 63, 126 S.Ct. at 2412.  *See also*

*Thompson v. North American Stainless, LP*, ---U.S.---, 131 S.Ct. 863, 868, 178 L.Ed.2d 694

(2011).  Gray has two ways of proving retaliation: directly or indirectly. *Kampmier*, 472 F.3d at

939.  To prove retaliation under the indirect method, Gray must show evidence of: "(1) a

statutorily protected activity; (2) an adverse action; and (3) a causal connection between the

two."  *Mobley v. Allstate Insurance Co.*, 531 F3d 539, 549 (7th Cir. 2008).

Gray filed grievances and charges of discrimination with the EEOC.  Gray alleges that he

was retaliated against for filing these charges because he received a 5-day suspension and

because U.S. Steel refused to pay him the $30,000 from a grievance settlement, refused to allow

him to work the 319 machine, refused to assign him weekend overtime, and refused to make

accommodations for his medical restriction.  Gray states that it was not until he filed the present

lawsuit that U.S. Steel provided him with the $30,000 he was promised in 2007.

Claims for retaliation for filing a grievance fall under the National Labor Relations Act.

*Carr v. Metals*, 2009 WL 483167, *12 (N.D. Ind.  Feb. 24, 2009). The NLRA states that it is an

unfair labor practice for an employer "to discharge or otherwise discriminate against an

employee because he has filed charges or given testimony under this chapter."  **29 U.S.C. §**

**158(a)(4).** The NLRA provides a comprehensive system to remedy conduct that is protected or

prohibited by the Act and deprives federal and state courts of jurisdiction. A plaintiff who desires

to proceed on a claim that falls under the NLRA must show that he has complied with the steps

set forth by the NLRA and filed his charge with the National Labor Relations Board for

resolution. *Carr*, 2009 WL 483167 at *12.

Gray has not provided any evidence that he filed his claim of retaliation for filing a grievance with the NLRB.  Because at this point in the litigation Gray must provide evidence to show that his claims have merit, his failure to show that he complied with the procedural prerequisites and filed a complaint with the NLRB is fatal to his claim. *Carr*, 2009 WL 483167 at *12. Absent such proof, this court lacks jurisdiction and summary judgment must be awarded to U.S. Steel on this issue.

Gray also engaged in a statutorily protected activity when he filed his prior lawsuit against the company in 2000, his appeal in 2001, and his EEOC charges in 2008 and 2009. However, any retaliation he alleges he suffered as a result of his prior lawsuit and appeal are outside the statute of limitations.  Therefore, the court is limited to looking at the actions U.S. Steel took following Gray's 2008 and 2009 EEOC charge.

Again, Gray complains that he was not assigned to the 319 machine, but as explained repeatedly throughout this order, that decision arose in the 1990s, was a discrete act, and cannot be found to be in retaliation for filing a charge two decades after the decision was made.  U.S. Steel allowed Swenton to operate the 319 machine well before Gray filed his 2008 EEOC charge, so this act was not in retaliation.  Before he filed his 2008 EEOC charge, Gray also had been advised that his $30,000 payment would be delayed due to discord over the 2007 MOA and Addendum in the Machine Shop.  Gray has not shown a causal connection between any of these actions and his 2008 EEOC charge.

Gray did point to some timely acts to show that he was retaliated against for filing his EEOC charge.  Gray alleged that in April 2009, his supervisor wrote him up for not wearing his shoes while on break but did not write up others outside the protected class for not wearing their

safety glasses or hats. He also has complained that he spoke with his supervisors about weekend overtime, that they made it clear he would not receive overtime because of his disabilities, and that one supervisor commented his discrimination complaints were pathetic.

The court already has explained that weekend overtime was rare and that U.S. Steel had been assigning the weekend overtime on the 319 machine to Swenton on an ongoing basis which pre-dated Gray's 2008 EEOC charge. Because he had been denied overtime on an ongoing basis pre-dating his EEOC charge, Gray has not provided any evidence that he was denied overtime because of his 2008 EEOC charge. Moreover, Gray spoke with his supervisors about weekend overtime in April 2007, before he filed his discrimination charge with the EEOC. Therefore, the evidence does not suggest that these acts were in retaliation for his EEOC charges. Gray was asked to work overtime on multiple occasions in 2008 and after, further showing that he was not denied overtime as a result of the charges he filed with the EEOC.

Although Gray was written up for not wearing his shoes during his break after filing his charge of discrimination, he has not shown either that this materially affected his employment or that his EEOC charge was the cause of being written up. The record does not suggest that he lost pay, damaged his career prospects, or suffered some other negative consequence arose as a result of being written up. Instead, he retired shortly after as the highest paid employee in the machine shop. There must be some additional indicia of causation, and Gray has not identified one.

Gray also claims that the Union retaliated against him for filing EEOC charges. Again, he has not shown that the Union treated his claims any less favorably. Most claims were arbitrated within the global settlement. Only one claim was removed, but the outcome was not more favorable than Gray's. Gray agreed to the settlement and received the highest award.

Although he claims he should have received more than Lobdell because he had more pending grievances which had been filed prior to Lobdell's, he has not shown that his grievances were worth more or were more meritorious. Overall, Gray has failed to show that either the Union or U.S. Steel took any retaliatory action against him stemming from his 2008 or 2009 EEOC charges. For this reason, summary judgment must be granted in favor of U.S. Steel and the Union on this issue.

Based on the foregoing reasons, the Motion for Summary Judgment [DE 77] filed by the Union and the Motion for Summary Judgment [DE 79] filed by U.S. Steel are **GRANTED.**

ENTERED this 17th day of December, 2013.


/s/ Andrew P. Rodovich
United States Magistrate Judge